**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alissa L. Allen, | No. CV-17-02543-PHX-BSB |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Alissa L. Allen ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for benefits under the Social Security Act (the "Act"). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure. As discussed below, the Court affirms the Commissioner's decision.

## I.     Procedural Background

On August 6, 2013, Plaintiff applied for a period of disability and disability insurance benefits alleging a disability onset date of July 24, 2012. (R. 20.)[1] After Plaintiff's application was denied on initial review and on reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (*Id.*) Following a hearing, the ALJ

---

[1] Citations to the "R" are to the certified administrative transcript of record. (Doc. 13.)

issued a decision finding Plaintiff not disabled under the Act. (R. 20–35.) Plaintiff requested review of the ALJ's decision. (R. 7–10, 15.) The Social Security Appeals Council denied Plaintiff's request for review and Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## II.    Administrative Record

The administrative record includes medical records pertaining to the history of diagnoses and treatment of Plaintiff's alleged impairments. The record also includes several medical opinions. The Court discusses the relevant records and opinions below.

### A.    Treatment Records related to Mental Impairments

#### 1.    LPC Hillary Shluker and Dr. S. David Hoffman

In July 2012, Licensed Professional Counselor ("LPC") Hillary Shluker (R. 606–15, 679–81) and Dr. S. David Hoffman (R. 606-17, 679-81) examined Plaintiff and evaluated her for a Seriously Mentally Ill ("SMI") Determination. (R. 606-16.) As part of that determination, LPC Shluker completed an "Assessment for Level of Care." (R. 606-13.) LPC Shluker noted that Plaintiff was hospitalized several times between 2002 and 2004 for psychiatric issues, including a suicide attempt. (R. 607.) LPC Shluker noted that Plaintiff's reported depression "as evidenced by feeling tired most of the day, not want[ing] to get out of bed," daily migraines, frequent isolation, and thoughts of wanting to die. (R. 608.) Plaintiff also reported "mania as evidenced by losing her temper easily, rapid pressured speech, [being] easily frustrated, [having] aggressive tendencies, cheating on her husband, sexually acting out, hyperactivity, impulsivity, excessive and compulsive spending, difficulty sleeping, [and] excessive cleaning." (*Id.*) Plaintiff reported symptoms of psychosis including hearing voices and seeing ghosts. (*Id.*) Plaintiff also reported instances of self-harm, including tearing "the skin off [her] hands constantly" to the point where she "had an exorcism" because Plaintiff's husband thought she was "possessed." (*Id.*)

On examination LPC Shluker observed that Plaintiff had a labile affect, was tearful, had pressured speech, concrete thought content, circumstantial thought process, and partial

judgment. (R. 610–11.) LPC Shluker concluded that Plaintiff appeared "to be suffering from a mood disorder as evidenced by periods of severe depression that occur[ed] for one week 4-5 times per year," and that caused Plaintiff to sleep "most of day and night," have suicidal ideations, frequent crying spells, and resentment that her 2004 suicide attempt was unsuccessful. (R. 612.) LPC Shluker further noted that Plaintiff's mania and depression symptoms had persisted since her adolescence and Plaintiff reported that her symptoms were "getting worse despite two hospitalizations and ongoing psychiatric medication monitoring." (*Id.*) LPC Shluker concluded that Plaintiff presented with symptoms of borderline personality disorder including "impulsivity in at least two self-damaging areas (compulsive spending and sexually acting out), recurrent self-mutilating behavior, affective instability due to irritability, unstable interpersonal relationships, chronic feeling of emptiness, and frequent displays of temper." (*Id.*)

LPC Shluker concluded that Plaintiff's persistent mood disorder was getting worse and that "outpatient psychiatric care and medication management [had] done little to improve her stability so far." (R. 615.) She further found that Plaintiff had difficulty with activities of daily living and was "not functioning well at home and [was] having difficulties functioning at work . . . ." (*Id.*) LPC Shluker opined that Plaintiff "would greatly benefit by the services offered from the SMI program." (*Id.*)

On July 30, 2012, Dr. Hoffman reviewed LPC Shluker's "clinical summary" and concluded that Plaintiff met "the criteria for SMI-A with a qualifying diagnosis and functional impairment of severe disruption of daily life with frequent thoughts of death, suicide, or self-harm." (R. 617.)

### 2. Winona Belmonte, M.D.

Psychiatrist Dr. Belmonte began treating Plaintiff on August 22, 2012. (R. 601–05.) On examination, Dr. Belmonte observed that Plaintiff had a cooperative attitude, depressed and sad mood, an appropriate and tearful affect, a goal directed thought process, good attention and concentration, grossly intact memory, and good insight and judgment. (R. 603-04.) Dr. Belmonte assessed Plaintiff as having "chronic suicidal thoughts" and

diagnosed Plaintiff with bipolar I disorder. (R. 604.) Dr. Belmonte prescribed various medications. (*Id*.)

During an October 25, 2012 appointment with Dr. Belmonte, Plaintiff reported that she was "not as depressed," but that she slept a lot. (R. 594.) On examination, Dr. Belmonte observed that Plaintiff had an appropriate affect, a euthymic mood, a cooperative attitude, logical thought process, good concentration and intact memory, good insight and judgment, and a good fund of knowledge. (*Id*.) Dr. Belmonte assessed that Plaintiff's depression was slightly improved, but she had "significant daytime sedation from her meds." (R. 595.) Dr. Belmonte adjusted Plaintiff's medications. (*Id*.)

Dr. Belmonte saw Plaintiff again on November 15, 2012. (R. 591–93.) Plaintiff reported that overall she was "not doing so well" since Seroquel was discontinued, but her sleep had improved. (R. 591.) Plaintiff reported increased anger and irritability and stated that she could not tolerate stress. (*Id*.) Plaintiff was also "getting to a point of suicidality." (*Id*.) Plaintiff reported the medication side effects caused "increased daytime sedation" that "[s]ignificantly interfered with function." (*Id*.) On examination, Dr. Belmonte observed that Plaintiff was alert, had an appropriate affect and tearful affect, had an angry, irritable, depressed mood, was cooperative, had a logical and non-psychotic thought process, had good concentration and intact memory, and good insight and judgment. (R. 592.)

Dr. Belmonte assessed that "[o]verall, [Plaintiff] ha[d an] increase in symptoms." (*Id*.) Dr. Belmonte restarted Seroquel, decreased the dosage of Depakote, and prescribed Clonazepam to counteract Plaintiff's increased irritability, anger, and anxiety. (*Id*.) Dr. Belmonte noted that plaintiff should return in one week and that Plaintiff should have more frequent appointments until her symptoms were "more under control." (*Id*.)

Dr. Belmonte saw Plaintiff again on November 27, 2012. (R. 588–90.) Plaintiff reported she was sleeping much less than at the time of her last appointment and that she was waking up happier. (R. 588.) Plaintiff reported that she felt "like her normal self . . . [and] was currently comfortable with [h]ow her meds [were] working for her."

(*Id*.) Additionally, Plaintiff stated that she was able to enjoy time with her family, better tolerate frustrating situations, and had reconnected with old friends that she had not seen for about a year. (*Id.*) On examination, Dr. Belmonte observed that Plaintiff was alert, had an appropriate affect, had a euthymic, angry, and irritable mood, was cooperative, had a logical and non-psychotic thought process, had good concentration and intact memory, and good insight and judgment. (R. 588.) Dr. Belmonte assessed that Plaintiff's mood had "improved to [where] she was her usual self" and she was stable on her medication. (*Id*.) Dr. Belmonte advised Plaintiff to return in eight weeks. (R. 589.)

Dr. Belmonte's treatment notes from a February 7, 2013 appointment record that Plaintiff was "clinically stable" and that her only complaints were "anger issues" and anxiety that was "manifested by [Plaintiff's] increased picking [of her skin]." (R. 586.)

During a June 27, 2013 appointment, Plaintiff reported that her mood was stable and she denied any "aggressive behavior or uncontrollable anger." (R. 578.) Plaintiff reported that her medications "were working quite well." (*Id*.) Plaintiff reported that she still had anxiety and continued to pick her skin. (*Id*.) Plaintiff was "tolerating" the Clonazepam "well." (*Id*.) Plaintiff also reported that her depression was "stable" on Wellbutrin and Lexapro. (*Id*.) She reported having felt down for a few days, but she was able to "manage her symptoms appropriately" and "was able to tolerate stress better." (*Id*.)

On examination, Dr. Belmonte observed that Plaintiff was alert, had an appropriate affect, had a euthymic, angry, and irritable mood, was cooperative, had a logical and non-psychotic thought process, had good concentration and intact memory, and good insight and judgment. (R. 579.) Dr. Belmonte assessed that Plaintiff was "clinically stable," "comfortable with how her current medication regimen [was] working," had "much decreased crying spells, decreased depressive symptoms, . . . no psychotic symptoms, [and was] able to tolerate her job better." (R. 580.) Dr. Belmonte advised Plaintiff to return in twelve weeks. (*Id*.)

///

///

### 3. Nurse Practitioner Jessica Dery

Nurse Practitioner ("NP") Dery also treated Plaintiff for ongoing symptoms of bipolar I disorder. (R. 648–51, 666, 691–96, 698–702, 714–16, 885–88, 894–98, 899–902, 903–05.) On October 18, 2013, NP Dery saw Plaintiff for a "routine medication check." (R. 691–94.) Plaintiff reported memory loss and migraines. (R. 691.) On examination, NP Dery found that Plaintiff exhibited a euthymic mood, did not appear to be an imminent risk to herself or others, had a cooperative attitude, had a logical and unremarkable thought process, that her thought-content was non-psychotic, her concentration was good, her memory intact, and her memory, intellect, insight, and judgment were all "fair." (R. 692.) NP Dery advised Plaintiff to return in four weeks. (R. 693.) Plaintiff continued treatment with NP Dery. (R. 698-702 (November 2013), 714-16 (January 2014, noting increased suicidal ideation), 903-05 (April 2014), 899-902 (June 2014, noting dysphoric mood, increased suicidal thoughts, increased "intrusive" (homicidal) thoughts), 894-98 (June 2014), R. 889-93 (August 2014, noting recent suicidal ideation, dysphoric mood), R. 885-88 (October 2014).)

### B. Treatment Records related to Physical Impairments

### 1. Marisa Sosinsky, M.D.

Neurologist Dr. Sosinsky treated Plaintiff for several physical impairments. (R. 793–94) (May 6, 2014), R. 795–96 (July 28, 2014), R. 797–98 (August 12, 2014), R. 799–803 (November 4, 2014), R. 804 (January 20, 2015), R. 936–40 (April 7, 2015), R. 931–34 (April 28, 2015).) She diagnosed Plaintiff with cervical and lumbrosacral radiculopathy at all of her appointments. (*Id.*) She also diagnosed Plaintiff with carpal tunnel syndrome and skin sensation disturbance (R. 797-800, 802, 804, 931-34, 936-40), and with migraines without aura. (R. 799-800, 802, 804. 931-34, 936-40.) In 2015, Dr. Sosinsky noted that Plaintiff had a history of migraine headaches and that she was having daily headaches, "many of which" were "migraine quality . . . at least half the days of the month." (R. 933, 939.) Dr. Sosinsky noted that Plaintiff's headaches had "significantly decreased" her quality of life. (*Id.*) Dr. Sosinsky noted that due to Plaintiff's

"severe history of mental health issues" certain medications for treating migraines were contraindicated. (*Id.*) She concluded that Botox was the most appropriate treatment. (*Id.*)

In January 2015, Dr. Sosinsky administered a Botox injection for Plaintiff's migraines and indicated that Plaintiff should receive injections every 90 days. (R. 804.) On April 7, 2015, Dr. Sosinsky again assessed migraine without aura, and noted that Plaintiff's migraines had decreased. (R. 938.) She diagnosed Plaintiff with chronic migraines and directed Plaintiff to return on April 28, 2015 for another injection. (R. 939.) On April 28, 2015, Dr. Sosinsky noted that the Botox injection was "dramatically effective" but had worn off during the past couple of weeks before Plaintiff's appointment. (R. 932.) Dr. Sosinsky administered another Botox injection and directed Plaintiff to repeat the procedure in three months. (R. 932, 933.)

### 2. Treatment at Central Mesa Medical

Beginning in June 2014, Plaintiff received treatment from several providers at Central Mesa Medical, including Travis Steigler, M.D., for migraines, joint pain, neck pain, low back pain, skin picking, and fatigue. (R. 973-1060.) During a June 23, 2014 appointment, Dr. Steigler diagnosed neck pain, low back pain, migraines, and bipolar disorder. (R. 1041.) Dr. Steigler noted that Plaintiff was in a car accident on June 2, 2014. (R. 1045.) Plaintiff reported waking up at night due to pain and complained of "constant migraines." (*Id.*) Dr. Steigler observed that Plaintiff had a reduced range of motion in the "cervical region [with] rotation, side bending, flexion, and extension." (R. 1046.) Dr. Steigler prescribed Gabapentin, Percocet, and Imitrex. (R. 1041.)

During a July 21, 2014 appointment, Dr. Steigler treated Plaintiff for low back pain and neck pain. (R. 1035.) Plaintiff described the pain as sharp and radiating. (R. 1036.) Plaintiff reported that pain caused her difficulty dressing and sleeping. (R. 1037.) Dr. Steigler diagnosed cervical bulging discs, neck pain, migraines, and lower extremity edema. (R. 1034.) He prescribed Oxycontin, Perocet, and Imitrex. (*Id.*) Dr. Steigler continued these prescriptions at Plaintiff's subsequent appointments. (R. 1037, 1039.) In

July 2015, Plaintiff had right upper extremity carpal tunnel decompression surgery. (R. 967.)

## C. Opinion Evidence

### 1. Jonna L. Krabbenhoft—Examining Physician

On November 20, 2012, Psychologist Dr. Jonna L. Krabbenhoft examined Plaintiff related to her mental impairments. (R. 571–76.) She also reviewed Plaintiff's medical records from May 2011 to July 2012 and reviewed two "Function Reports" that Plaintiff completed as part of her application for disability benefits. (R. 571.) Plaintiff reported that she could not work because she could not "get along with people and [had] nervous breakdowns, and [was] depressed a lot." (*Id.*) Plaintiff reported that she had been "suicidal since age ten" and she received treatment for suicidal ideations, including a hospital stay sometime between 2000 and 2002. (R. 572.) Plaintiff reported that, roughly a year later, she was hospitalized after she tried to commit suicide. (*Id.*)

Plaintiff also reported that, at the time of her appointment with Dr. Krabbenhoft, she was taking Depakote, Wellbutrin, Seroquel, Klonopin, and Lexapro and experienced some side effects. (*Id.*) Plaintiff explained that Depakote caused her to experience increased agitation at night and that when one of her providers "attempted to discontinue Seroquel" her anger increased and she "was extremely mad at everybody." (*Id.*) Plaintiff denied any recent suicide attempts and reported that she continued to have "extreme nervous breakdowns when under stress," mood swings, excessive tearfulness, feelings of hopelessness and helplessness, and suicidal ideation. (*Id.*)

Dr. Krabbenhoft diagnosed Plaintiff with mood disorder, not otherwise specified ("NOS") with psychotic features, personality disorder, NOS traits, and migraines. (R. 574.) Dr. Krabbenhoft opined that Plaintiff's prognosis was "[g]uarded" due to "reported ongoing suicidal ideations and 'breakdowns.'" (*Id.*)

### 2. NP Dery and Dr. Araashdeep Gill

On November 4, 2013, NP Dery at Partners in Recovery completed a "Medical Assessment of Claimant's Ability to Perform Work Related Activities (Mental)." (R. 695.)

NP Dery opined that Plaintiff had mild "deterioration in her personal habits" and "constriction of interests." (*Id*.) NP Dery also opined that Plaintiff had moderately severe limitations in her abilities to relate to other people, to perform daily activities, to understand, carry out, and remember instructions, to respond appropriately to supervisors and co-workers, to respond appropriately to customary work pressure, and to perform simple tasks. (*Id*.) NP Dery indicated that Plaintiff's limitations had "lasted or [could] be expected to last twelve months or longer." (R. 696.) Beneath that statement she wrote "dependent on findings from Barrows Neurological [Institute]." (*Id*.) In response to whether Plaintiff's "psychiatric symptoms were exacerbated by a general medical condition," NP Dery wrote "memory loss follow up at Barrows." (*Id*.) NP Dery opined that Plaintiff's psychiatric symptoms moderately limited "the sustainability of work pace." (*Id*.)

NP Dery indicated that, as of the date of her opinion, she had treated Plaintiff once and she had considered or reviewed "records from other providers, mental status examination, [and Plaintiff's] response to treatment . . . ." (*Id*.) NP Dery indicated that the limitations she assessed "result[ed] from objective, clinical, or diagnostic findings which [were] documented either by [her], or elsewhere in [Plaintiff's] medical records." (*Id*.)

In an undated letter addressed "to whom it may concern," Dr. Gill from Partners in Recovery stated that Plaintiff's "case . . . was reviewed by [NP] Dery in collaboration with Dr. Araashdeep Gill, Chief Psychiatrist." (R. 703.) Dr. Gill stated that the assessment was based on "past treatment documentation and most recent assessment." (*Id*.) Dr. Gill agreed with NP Dery's assessment. (*Id*.)

### 3. Dr. Maria Sosinsky

In May 2015, Dr. Sosinsky completed a "Medical Assessment of Ability to do Work-Related Physical Activities."[2] (R. 910–11.) Dr. Sosinsky opined that Plaintiff's headaches limited her ability to perform work related activities. (R. 910.) Dr. Sosinsky

---

[2] Plaintiff refers to this opinion as a May 2015 opinion, but the ALJ refers to it as a May 2013 opinion. (Doc. 16 at 7; R. 32.) The handwritten date on Dr. Sosinsky's opinion is difficult to read. (Tr. 911.) However, the Court concludes that it is from 2015 because it refers to Plaintiff's treatment with Botox that began in January 2015. (R. 804, 910.)

indicated that, "without her current Botox treatments," Plaintiff had "severe migraine" headaches four to five times a week that lasted for three or more hours. (*Id.*) Dr. Sosinsky noted that Plaintiff had "ancillary symptoms" of nausea, fatigue, and pain that were increased by stress and physical activity. (*Id.*) She noted that medications and rest decreased Plaintiff's symptoms. (*Id.*)

Dr. Sosinsky opined that Plaintiff had "moderate" "[r]estrictions in activities involving" unprotected heights, moving machinery, exposure to "marked changes in temperature and humidity, and exposure to dust, fumes[, and] gases." (R. 911.) She also opined that Plaintiff's "degree of restriction" was "moderately severe" when Plaintiff's headaches were "active." (*Id.*) Moderately severe was defined being off task 16 to 20% of an eight-hour work day. (*Id.*) Dr. Sosinsky stated that the assessed limitations could "reasonably be expected to result from objective clinical or diagnostic finding which have been documented either by [her], or elsewhere in [Plaintiff's] medical records." (*Id.*)

### 4.   Reviewing Physicians

In December 2013, as part of the initial review of Plaintiff's application for benefits, "RC, Ph.D" ("RC") reviewed Plaintiff's medical records related to her mental impairments and completed a mental residual functional capacity ("RFC") assessment. (R. 106–08.) RC opined that Plaintiff had no limitations in her abilities to remember and understand. (R. 106.) RC found that Plaintiff was "not significantly limited" in her abilities to "carry our short and simple instructions," perform activities within a schedule, maintain attendance, and be punctual within customary tolerances," "sustain an ordinary routine without special supervision," "work in coordination with or in close proximity to others without being distracted by them," and "make simple work-related decisions." (R. 105-06.)

RC found Plaintiff "moderately limited" in her abilities to maintain attention and concentration for extended periods, and "to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 107.) RC also found

that Plaintiff was not significantly limited in her abilities to interact socially.  (*Id*.)  RC concluded that Plaintiff could "perform simple and some complex tasks with routine supervision," could "relate to supervisors and peers on a superficial work basis," and "tolerate incidental contact with the general public," but should avoid work that required "frequent and necessary public contact."  (*Id*.)  On February 24, 2014, "WF, Ph.D" reviewed the medical evidence and "affirmed the assessment of 12/13/13."  (R. 120–21.)

On February 26, 2014, Dr. Karl Boatman reviewed the record and completed a mental RFC assessment.  (R. 122–24.)  Dr. Boatman assessed the same limitations as RC.  (*Compare* R. 106–08. *with* R. 122–24.)  Dr. Boatman opined that Plaintiff could maintain employment that involved "simple tasks with routine supervision."  (R. 124.)  He further stated that Plaintiff could "tolerate incidental contact with the general public" but she should avoid work "where public contact [was] frequent and necessary."  (R. 123.)

### III.    The Administrative Hearing

Plaintiff was forty-three years old as of the date of the administrative hearing.  (R. 50.)  Plaintiff had a high school education and past relevant work as a personal home attendant, kitchen helper, babysitter/child monitor, assistant manager in the clothing industry, and a merchandise marker.  (R. 33, 51–57.)

Plaintiff testified that she was unable to work because she had "a hard time getting along with other people" and had threatened others with violence in the past.  (R. 58.)  Plaintiff testified that when she got upset, she felt suicidal.  (*Id*.)  Plaintiff explained that during those times she stayed home in her room.  (R. 65.)  Plaintiff testified that, at the time of the administrative hearing, she stayed in her room "all day long, every day," but tried to come out and eat dinner with her family.  (Tr. 70.)

Plaintiff further testified that she had chronic pain that she believed was caused by the Epstein Barr virus.  (R. 63.)  Plaintiff stated that it made her feel like she had the flu and made her "muscles and everything just hurt really bad."  (*Id*.)  Plaintiff testified that she had headaches "almost every day" and that a "really bad one" would last for three days.

(R. 67.) Plaintiff testified that she had lower back pain and neck pain that travelled down to her shoulders. (R. 68.)

A vocational expert ("VE") also testified at the administrative hearing. (R. 78-81.) In response to the ALJ's hypothetical question, the VE testified that a person who was limited to light work, frequent handling and fingering, who could perform only simple, routine, repetitive tasks, who could relate to supervisors and coworkers on a superficial basis, and who should not be exposed to hazards such as moving machinery or unprotected heights, could perform Plaintiff's past relevant work as a merchandise marker and could perform other jobs that existed in significant numbers in the national economy, including housekeeping cleaner and routing clerk. (R. 78-79.) The VE also testified that a person who would be off-task 16 to 20% of the time in their ability to understand, carry out, and remember instructions, respond appropriately to supervisors and coworkers, respond to customary work pressures, and to perform simple tasks would be unable to perform any work. (R. 80.)

In response to questions from Plaintiff's counsel, the VE also testified that work would be precluded for a person who would be "off task" 11% of the day. (R. 81.) The VE further testified that a person who "would require unscheduled breaks . . . for three hours at a time three times a month" could not sustain work. (*Id.*) Additionally, a person who had "outbursts" at work involving screaming or threatening a co-worker, supervisor, or member of the public would not be able to sustain work. (R. 81-82.)

## IV.   The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (providing a nearly identical standard for supplemental security income disability insurance benefits). To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation

process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see, e.g.*, *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

### A.  The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b), 404.1520(c), 416.920(b), 416.920(c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five.

At step three, the claimant may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d).  If claimant can prove such an impairment, the claimant is presumptively disabled within the meaning of the Act.  (*Id.*)  If not, the ALJ determines the claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  20 C.F.R. §§ 404.1520(g), 416.920(g); *see, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.").  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.  20 C.F.R. § 404.1520(a); *see, e.g.*, *Garrison*, 759 F.3d at 1011.

### B.  The ALJ's Application of the Five-Step Evaluation Process

At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 24, 2012—the alleged disability onset

date.  (R. 22.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "obesity, bipolar disorder, borderline personality disorder, plantar fasciitis, gastroesophageal reflux disease, chronic kidney disease, carpal tunnel syndrome (status post right carpal tunnel release in July 2015), cervical radiculopathy, history of migraine headaches, and degenerative disc disease."  (R. 23.)  At step three, the ALJ found that Plaintiff's severe impairments did not meet or equal an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (R. 24.)

The ALJ next determined Plaintiff's RFC.  (R. 27.)  The ALJ concluded that Plaintiff had the RFC to "perform light work as defined in 20 C.F.R. § 404.1567(B), which consists of lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, with frequent but not constant handling and fingering."  (*Id*.)  The ALJ also found that Plaintiff could perform simple, routine, and repetitive tasks involving simple work-related decisions and simple instructions, with few changes in the work setting, as well as relate to supervisors and coworkers on a superficial work basis.  (*Id.*)  The ALJ clarified that Plaintiff should (1) "avoid hazards such as moving machinery and unprotected heights," (2) avoid "regular public contact" (but could have incidental contact with the public), and (3) limit herself to work that involved "one to three step tasks that involve[d] one to three step instructions."  (*Id.*)

At step four, the ALJ concluded that Plaintiff could perform her past relevant work as a merchandise marker, because it did "not require the performance of work-related activities precluded by claimant's residual functional capacity."  (R. 34.)  Alternatively, the ALJ found that based on Plaintiff's age, education, and RFC, Plaintiff could perform "other jobs that exists in significant numbers in the national economy," including housekeeping cleaner and routing clerk.  (R. 34-35.)

Therefore, the ALJ concluded Plaintiff was not under a disability as defined in the Act from the onset date through the date of the ALJ's decisions.  (R. 35.)  Accordingly, the ALJ denied Plaintiff's application for disability benefits.  (*Id.*)

**V.      Standard of Review**

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

Furthermore, the court applies the harmless error doctrine when reviewing an ALJ's decision. Thus, even if the ALJ erred, the decision will not be reversed if the error is "inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error "does not negate the validity of the ALJ's ultimate conclusion"); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (stating that "[a] decision of the ALJ will not be reversed for errors that are harmless.").

**VI.    Plaintiff's Claims**

Plaintiff argues that the ALJ erred by (1) discounting treating physician Dr. Sosinsky's opinion and NP Dery's opinion, with which Dr. Gill agreed, and (2) discounting Plaintiff's symptom testimony without providing clear and convincing reasons that were supported by substantial evidence. (Doc. 16 at 1.) Plaintiff argues that these errors were harmful. (*Id.*) The Commissioner argues that the ALJ's decision is free of harmful error. (Doc. 20.)

**A.    Weight Assigned to Medical Opinions**

In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id.* The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with

the record as a whole; [and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631; *see Garrison v. Colvin*, 759 F.3d 995, 1012 n.11 (9th Cir. 2014).

### 1.     Weight Assigned to Dr. Sosinsky's Opinion

Dr. Sosinsky opined that, due to her migraine headaches, Plaintiff had "moderate" "restrictions in activities involving" unprotected heights, moving machinery, marked changes in temperature or humidity, or exposure to dust, fumes, and gases. (R. 911.)  She then opined that Plaintiff's "degree of restriction" was "moderately severe" when Plaintiff's "headaches [were] active." (*Id.*)  Moderately severe was defined as being "[o]ff task 16-20% of an 8-hour work day." (*Id.*)  The ALJ assigned Dr. Sosinsky's opinion "minimal weight" because Plaintiff had "very few treatment visits" with Dr. Sosinsky, and because the ALJ believed that "the course of the treatment [did] not appear to be what would be expected, given [the] allegation of disabling symptoms and limitations." (R. 32.)

### a.     Few Treatment Visits

The ALJ gave Dr. Sosinsky's opinion minimal weight because she concluded that Dr. Sosinsky had "very few treatment visits" with Plaintiff. (R. 32.)  The Commissioner does not defend this rationale. (Doc. 20 at 13 (stating that the Commissioner "declines to defend the ALJ's finding that Plaintiff had very few treatment visits with Dr. Sosinsky").)  Because the Commissioner does not defend this rationale and because the record reflects that Dr. Sosinsky had seven appointments with Plaintiff (R. 776-78, 795, 797-98, 799-803, 804-05, 931-34, 936-40), the Court concludes that the ALJ erred by discounting Dr. Sosinksy's opinion based on her conclusion that Plaintiff had "very few" treatment visits with Plaintiff.

### b.     Conservative Treatment

The ALJ also gave Dr. Sosinsky's opinion minimal weight based on the ALJ's belief that the "course of treatment [did] not appear to be what would be expected, given [the] allegation of disabling symptoms and limitations." (R. 32.)  The ALJ noted Plaintiff's history of daily headaches since age twenty and that she underwent a neurology evaluation in 2012. (R. 29.)  The ALJ noted that there was little evidence of treatment for headaches

from early 2012 to October 2013. (*Id.*) The ALJ further noted that in 2014 Plaintiff's headaches were managed with Excedrin, and in 2015 they were managed with Botox injections. (R. 29.)

As the ALJ noted, Plaintiff received treatment from a specialist, neuorologist Dr. Sosinsky, for her migraines. In addition to prescribing medication for Plaintiff's migraine headaches, Dr. Sosinsky administered regular Botox injections. (R. 804, 931-34.) The ALJ did not explain why Plaintiff's course of treatment, that included treatment with a specialist, was conservative or identify what she considered an appropriate course of treatment for someone with Plaintiff's alleged symptoms. (R. 32.)

The ALJ's conclusory assertion that the course of treatment was not what one would expect considering Plaintiff's alleged symptoms does not satisfy the standard required for rejecting a treating physician's opinion.[3] *See* 20 C.F.R. §§ 404.1527, 416.927; *Swanson v. Sec'y of Health and Human Servs*, 763 F.2d 1061, 1065 (9th Cir.1985) (stating that an ALJ properly rejects a treating physician's opinion if he sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states his interpretation of the facts and conflicting evidence, and makes findings.) The ALJ must do more than offer her conclusions. "[Sh]e must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006).

The ALJ did not satisfy this burden in concluding, without explanation, that the course of treatment that Plaintiff received for her migraine headaches was not what would be expected considering Plaintiff's alleged symptoms. *See Reding v. Berryhill*, 2018 WL 3448600, at *2 (W.D. Wash. July 7, 2018) (stating that the fact that a claimant with migraine headaches "did not follow a course of treatment not recommended by her doctors does not undermine her complaints or [a treating doctor's] opinion.") Therefore, the ALJ's

---

[3] The agency has amended regulations for evaluating medical evidence, but the amended regulations (in pertinent part) only apply to claims filed on or after March 27, 2017, and therefore are not relevant to this case. *See* 20 C.F.R. § 404.1527 (applicable to claims filed before March 27, 2017); § 404.1520c (applicable to claims filed after March 27, 2017).

conclusory assertion does not constitute a legally sufficient reason for discounting Dr. Sosinsky's opinion.

### c.    Harmless Error

As discussed above, the ALJ failed to provide legally sufficient reasons for discounting Dr. Sosinsky's opinion. Plaintiff argues that the error was harmful because during the administrative hearing the vocational expert testified that an individual with the limitations that Dr. Sosinksy identified would be unable to perform any work. (R. 80.) The Commissioner argues that the error was harmless. (Doc. 20 at 8.) As discussed below, the Court agrees with the Commissioner.

The ALJ's RFC assessment incorporated some of the restrictions Dr. Sosinksy assessed by providing that Plaintiff should avoid moving machinery and unprotected heights. (R. 27.) The VE testified that a person with these restrictions, and the other restrictions in the RFC, could perform Plaintiff's past relevant work as a merchandise marker (Dictionary of Occupational Title ("DOT") 209.587-034) or could perform "other work" as a housekeeping cleaner (DOT 323.687-014) or routing clerk (DOT 222.587-038). (R. 78-80.) The Commissioner notes, and Plaintiff does not dispute (Doc. 21), that these jobs do not require exposure to any of the environmental hazards, including marked changes in temperature or humidity and exposure to dust, fumes, and gases, that Dr. Sosinsky identified in her opinion.    (Doc. 20 at 15; R. 910-11.)    Thus, the Commissioner argues that even if the ALJ erred by rejecting Dr. Sosinsky's opinion, the error was harmless because the jobs upon which the ALJ relied in finding Plaintiff not disabled did not involve any of the environmental hazards that Dr. Sosinsky identified in her opinion. (Doc. 20 at 15; R. 34-35.)

Plaintiff asserts that the VE testified that an individual with the limitations Dr. Sosinsky assessed would be unable to work. (Doc. 16 at 18 (citing R. 80).) On page 80 of the administrative record, the VE testified that work would be precluded for an individual who would be off task 16 to 20% of an eight-hour day in the areas of understanding, carrying out and remembering instructions, responding appropriately to

supervisors and co-workers, responding appropriately to customary work pressures, and performing simple tasks. (R. 80.) Dr. Sosinsky did not assess any restrictions in these areas. (R. 910-11.) On page 80 of administrative record, the VE also testified that work would be precluded for an individual who required unscheduled breaks of three hours or more four to five times week. (R. 80.) Again, Dr. Sosinsky did not assess Plaintiff with this restriction. (R. 910-11.) Thus, contrary to Plaintiff's assertion, on page 80 of the administrative record, the VE did not testify that an individual with the restrictions Dr. Sosinsky identified would be unable to perform any work.

As previously noted, Dr. Sosinsky opined that Plaintiff would be off task 16 to 20% of an eight-hour day in activities involving unprotected heights, moving machinery, marked changes in temperature or humidity, or exposure to dust, fumes, and gases. (R. 911 (finding that Plaintiff had moderate restrictions in activities involving these environmental hazards and that the restrictions were "moderately severe" when Plaintiff's headaches were "active").) These are the only restrictions Dr. Sosinsky identified. (R. 910-11.) On page 81 of the administrative record, the VE testified that work would be precluded for an individual who would be "off task 11 percent of the day." (R. 81.) However, the VE did not testify that work was precluded for an individual who would be off-task in relation to activities involving the environmental hazards that Dr. Sosinsky identified. (*Id*.)

Additionally, as the Commissioner noted, the jobs upon which the ALJ relied in finding Plaintiff not disabled (merchandise marker DOT 209.587-034, housekeeping cleaner DOT 323.687-014, and routing clerk DOT 222.587-038) do not require exposure to any of the environmental hazards that Dr. Sosinsky identified in her opinion. (Doc. 20 at 15; R. 34-35.) Therefore, the Court concludes that the ALJ's error in relation to Dr. Sosinsky's opinion was harmless.

### 2. Weight Assigned to NP Dery's and Dr. Gill's Opinions

In November 2013, NP Dery, a provider at Magellan/Partners in Recovery, opined that Plaintiff had moderately severe limitations in understanding, carrying out, and remembering instructions, responding appropriately to supervisors and co-workers,

responding to customary work pressures, and performing simple tasks. (R. 695.) NP Dery also opined that Plaintiff's ability to sustain a work pace was moderately limited, meaning that she would be off-task 11-15% of an eight-hour workday. (R. 696.) Dr. Gill agreed with NP Dery's assessment. (R. 703.) Plaintiff argues that the ALJ erred by rejecting NP Dery's assessment, with which Dr. Gill agreed. (Doc. 16 at 13-14.)

To reject the contradicted opinions of medically acceptable treating sources, an ALJ must provide specific, legitimate reasons based on substantial evidence. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). For claims filed after March 27, 2017, acceptable medical sources include licensed advanced practice nurses and licensed physician assistants. 20 C.F.R. § 404.1502(a). However, under the regulations in effect at the time of the ALJ's decision in 2016, a nurse practitioner was not considered an acceptable medical source. *See* 20 C.F.R. § 404.1513(d) (2016). Because NP Dery is an "other source," the ALJ only needed to provide "germane reasons" for rejecting her opinions. *Molina*, 674 F.3d at 1111; *Dale v. Colvin*, 823 F.3d 941, 947 (9th Cir. 2016).

The Commissioner argues that Plaintiff attempts to elevate NP Dery's opinion to that of an acceptable medical source by pointing out Dr. Gill's agreement with NP Dery's opinion. (Doc. 20 at 9-11.) In her opening brief, Plaintiff focuses on NP Dery's opinion and does not specifically argue that the ALJ erred by rejecting Dr. Gill's acceptance of that opinion. (Doc. 16 at 13-14.) Additionally, in her reply Plaintiff clarifies that she does not argue that Dr. Gill treated Plaintiff or argue that because Dr. Gill agreed with NP Dery's opinions her opinion should be treated as that of an acceptable medical source. (Doc. 21 at 3.) The Court, therefore, considers NP Dery's opinion as that of a nurse practitioner, an "other source," and does not consider Dr. Gill's agreement with that opinion as a separate opinion or as an opinion that lends additional weight to NP Dery's opinion.

### a. Opinion Given After One Appointment

The ALJ assigned NP Dery's opinions "minimal weight" because she is a nurse practitioner, she "provided her opinion after only one visit," and because the ALJ found that "[t]here [was] no reason to believe that the restrictions were intended to persist for 12

months." (R. 32.) Plaintiff argues that these were not germane reasons for rejecting NP Dery's opinion. (Doc. 16 at 13-14.) In response, the Commissioner only defends two of these reasons—that NP Dery saw Plaintiff only once before giving her opinion, and that NP Dery's opinion was equivocal about the duration of the assessed limitations. (Doc. 20 at 11-12.)

The parties do not dispute that NP Dery saw Plaintiff only one time before she completed the medical assessment of Plaintiff's ability to do work-related activities (mental). (R. 695-96 (stating that NP Dery had treated Plaintiff once on October 18, 2013).) Thus, the ALJ's assessment of NP Dery's opinion was supported by the germane reason that she gave her opinion after a single visit with Plaintiff. *See Hixson v. Colvin*, 2014 WL 3608899, at *8 (E.D. Wash. Jul. 22, 2014) (ALJ properly discounted "other source" opinion that was given after one visit with the claimant and that was contradicted by the treatment notes); *Cleveland v. Astrue*, 2010 WL 1678294, at *9 (C.D. Cal. Apr. 23, 2010) (ALJ properly discounted a social worker's opinion that was based on only one meeting and that was not supported by a "longitudinal objective record").

### b.  Duration of Limitations

The ALJ also discounted NP Dery's opinion because "there was no reason to believe that the restrictions were intended to persist for 12 months." (R. 32.) Plaintiff argues that the ALJ's conclusion "is belied by the assessment itself." (Doc. 16 at 4.) The Court disagrees. On the assessment form, NP Dery indicated "yes" in response to a question that asked whether Plaintiff's limitations had "lasted or [could] be expected to last twelve months or longer." (R. 696.) Beneath that statement NP Dery wrote "dependent on findings from Barrows Neurological [Institute]." (*Id.*) Thus, NP Dery's opinion that the limitations she assessed would last twelve months or longer was equivocal.

In the disability analysis, a twelve-month period comprises the duration requirement. 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A). Unless an impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1509 and 416.909. Thus, the twelve-

month time period is germane and, therefore, the ALJ did not err in giving NP Dery's opinion little weight based on her equivocal response about the duration of Plaintiff's limitations. *See Derryberry v. Comm'r of Soc. Sec.*, 2017 WL 1130367, at *9 (D. Ariz. Mar. 27, 2017) (the ALJ did not err by discounting physician's equivocal opinion); *see also Schwanz v. Astrue*, 2011 WL 4501943, at *5 (D. Oregon Sept. 28, 2011) (concluding that the ALJ did not err in discrediting a lay witness statement that involved an eight-month period); *Molina v. Berryhill*, 734 F. App'x 492, 494 (9th Cir. 2018) (concluding that the ALJ provided a germane reason for rejecting a chiropractor's opinion that the claimant's limitations would last two weeks because it did not support the assertion that the claimant's limitations met the durational requirement for disability under the Act); *Megan v. Berryhill*, 2018 WL 4772219, at *2 (W.D. Wash. Oct. 3, 2018) (ALJ did not err by rejecting a nurse's opinion that was qualified by stating that the claimant's "diagnosis was not yet clear," and that opined that the claimant's limitations would last six months, which did not met the twelve-month duration required).

Therefore, the Court concludes that the ALJ provided germane reasons for discounting NP Dery's opinion. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (an ALJ must give at least one "germane" reason for discounting the opinion of an other source).

### B.     Plaintiff's Symptom Testimony

Plaintiff asserts that the ALJ erred by failing to provide "specific, clear, and convincing" reasons for discounting her subjective complaints. (Doc. 16 at 18.) The Commissioner defends the ALJ's assessment of Plaintiff's symptom testimony. (Doc. 20 at 3-8.) As discussed below, the Court finds that the ALJ provided legally sufficient reasons for rejecting Plaintiff's symptom testimony.

An ALJ uses a two-step analysis to evaluate a claimant's subjective symptom testimony. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which

could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)). The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1160-61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for discounting the symptom testimony. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting her symptom testimony. (Doc. 16 at 18.) As set forth below, the Court concludes that the ALJ did not err by discounting this testimony.

As Plaintiff notes, her symptom testimony was of a "rambling nature." (Doc. 21 at 8.) However, Plaintiff reported that she was unable to work "due to symptoms associated with psychiatric impairments, migraines, osteoarthritis, and degenerative disc disease."

(R. 28.)  Plaintiff reported that she had difficulty with talking, remembering, completing tasks, concentrating, understanding, and following instructions.  (*Id.*)  Plaintiff estimated that she could sit for up to 1.5 hours and stand for up to ten minutes.  (*Id.*)  Plaintiff testified that she stayed in her room most of the day but tried to get up for dinner with her family.  (*Id.*)

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible . . . ."  (R. 29.)  As discussed below, the ALJ rejected Plaintiff's symptom testimony because the ALJ concluded that: (1) the record did "support the severity of symptoms alleged"; (2) Plaintiff's symptoms were "relatively controlled with treatment"; (3) there were inconsistencies in the record including (a) Plaintiff's "history of inconsistent earnings, (b) Plaintiff's need to use a wheelchair, (c) Plaintiff's testimony that she spent most of her time in her room; and (d) Plaintiff's report of side effects from her medication; and (4) Plaintiff engaged in various daily activities.

### 1.        Lack of Objective Support

The ALJ discounted Plaintiff's symptom testimony because she found that "the record [did] not support the severity of the symptoms alleged."  (R. 31.)  After a claimant produces objective medical evidence of an underlying impairment, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the claimant's allegations."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009).  However, it is a relevant factor in determining the severity of a claimant's symptoms.  *Rollins v. Massanri*, 261 F.3d 853, 857 (9th Cir. 2001).  Therefore, the ALJ could consider the lack of corroborating medical records in determining the severity of Plaintiff's symptoms but could not reject Plaintiff's testimony solely on this basis.

Substantial evidence in the record supports the ALJ's conclusion that the objective evidence did not support Plaintiff's allegations of disabling symptoms.  For example, 2010

diagnostic imagining of Plaintiff's back, hip, and hands revealed no significant abnormalities. (R. 411-12.) A 2012 Computer Tomography ("CT") of Plaintiff's head and brain was also "negative." (R. 626.) Imaging in May 2014 revealed evidence of cervical radiculopathy and lumbosacral radiculitis, however "EMG and nerve conduction studies did not show any basis for [Plaintiff's] ongoing symptoms." (R. 939.)

### 2. Symptoms Controlled with Treatment

The ALJ discounted Plaintiff's symptom testimony because she concluded that Plaintiff's "symptoms were relatively controlled with treatment." (R. 31.) The effectiveness of medication or treatment is a relevant factor in determining the severity of Plaintiff's symptoms. 20 C.F.R. § 404.1529(c)(3). Plaintiff challenges this rationale on the ground that "the ALJ did not provide citations in the record to support this conclusion." (Doc. 16 at 20.) However, in the section of her decision assessing Plaintiff's symptom testimony, the ALJ discussed in detail Plaintiff's impairments and the related treatment. (R. 29-31.)

The ALJ provided citations to the record indicating that Plaintiff's symptoms, including her headaches and mental impairments, were controlled with treatment. (*Id*.) As the ALJ noted, the record reflects that Plaintiff reported that her headaches "dramatically" decreased after the Botox injections and that she was stable on her medications for her mental impairments. (R. 804, 931-34, 938-39; 578, 579-80, 586, 588.) Plaintiff's foot pain was relieved with wearing tennis shoes or staying off of her feet. (R. 451.) The record also indicates that Plaintiff's neck and back pain was successfully treated with chiropractic adjustments between 2012 and 2014. (*See e.g.* R. 760 (reporting that low back conditions had improved 40%, muscle spasms and joint inflammation and pain had decreased); R. 762 (reporting 60% improvement in neck and back conditions, improved range of motion in thoracic and lumbar spine, decreased joint inflammation and pain); R. 764 (reporting 90% improvement in neck and back conditions, improved ability to exercise, participate in hobbies, and perform activities of daily living, decreased muscle spasms, joint inflammation and pain), R. 765 (reporting 100% improvement in neck and back conditions

and "no symptoms"), R. 766 (reporting increased neck, upper back, and central back pain but noting that Plaintiff "continue[d] to respond to chiropractic care with improved range of motion, better posture and spinal health").)

Evidence that a claimant's symptoms were controlled with treatment can be a legally sufficient reason for discounting her symptom testimony. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). The Court concludes that the ALJ properly discounted Plaintiff's symptom testimony based on substantial evidence in the record that her impairments were controlled with treatment.

### 3.     Inconsistencies in the Record

The ALJ discounted Plaintiff's symptom testimony due to inconsistencies in the record including (a) Plaintiff's "history of inconsistent earnings," (b) Plaintiff's testimony about using a wheelchair, (c) Plaintiff's testimony about spending most of her time in her room, and (d) Plaintiff's reported side effects from her medication.

#### a.     Plaintiff's Work History

The ALJ also discounted Plaintiff's symptom testimony because she had a "history of inconsistent earnings and her earnings record [did] not document all work activity reported." (R. 32.) The ALJ found that this incomplete work history raised questions about whether Plaintiff's "continued unemployment [was] due to reasons unrelated to her alleged impairments." (*Id.*) Evidence that a claimant quit working for a non-medical reason is a clear and convincing reason for discounting her symptom testimony. *See Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (concluding that a claimant's pain complaints were not credible because he reported at the administrative hearing, and also to at least one doctor, that he left his job because he was laid off, not because he was injured).

However, substantial evidence in the record does not support the ALJ's speculation that Plaintiff may have been unemployed for reasons other than her alleged impairments. The record reflects that Plaintiff reported earnings for 2007, 2008, 2009, 2010, 2011, and

2012. (R. 218-19.) Plaintiff alleged disability beginning on July 24, 2012. (R. 20.) In *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), the court noted that claimant's "spotty work history" supported the ALJ's adverse credibility determination. However, unlike this case, the claimant in *Thomas* had gaps of several years between jobs. *Thomas*, 278 F.3d at 959. The Court concludes that Plaintiff's inconsistent work history was not a clear and convincing reason for discounting her symptom testimony.

### b.    Testimony that Plaintiff used a Wheelchair

The ALJ noted that Plaintiff testified that she used a wheelchair whenever she left the house in 2013 and 2014, but that the medical treatment records did not mention a wheelchair. (R. 32.) The ALJ concluded that the absence of medical evidence regarding a wheelchair "raised the question whether additional information provided is similarly unreliable." (*Id.*)

The absence of evidence of a wheelchair in the medical record did not constitute a clear and convincing reason for discounting Plaintiff's symptom testimony. *See Trevizo v. Berryhill*, 871 F.3d 664, 682 n. 10 (9th Cir. 2017) (finding "the absence of medical records regarding alleged symptoms is not itself enough to discredit a claimant's testimony.") Plaintiff testified that she had her "own wheelchair" that she used because she had leg pain that made it difficult to walk. (R. 63, 68.) Plaintiff testified that the wheelchair was not prescribed by a doctor and that she started using it before she was diagnosed with Esptein-Barr. (R. 68.) Because Plaintiff testified that the wheelchair was not prescribed, the lack of evidence about a wheelchair in the medical record was not inconsistent with her testimony. Therefore, the ALJ erred by discounting Plaintiff's symptom testimony based on the absence of medical evidence regarding a wheelchair.

### c.    Plaintiff's Testimony about Isolating Herself

Plaintiff testified that at the time of the 2015 administrative hearing she spent most of her time in her room. (R. 70.) The ALJ concluded that Plaintiff's testimony that she spent most of her time in her room was inconsistent with Plaintiff's report to a medical

professional that she went on a camping trip with her family, and inconsistent with evidence that she worked after the alleged disability onset date.  (R. 32.)

In support of the ALJ's conclusion, the Commissioner cites to an August 2014 treatment note stating that Plaintiff cancelled surgery for her carpal tunnel syndrome, which was scheduled for August 29, 2014, to go on a family camping trip.  (Doc. 20 at 6 (citing R. 890).)  Evidence that Plaintiff went on one family camping trip in August 2014 is not inconsistent with Plaintiff's testimony that at the time of the administrative hearing in 2015 she spent most of her time in her room.

The ALJ also found Plaintiff's 2015 testimony that she spent most of her time in her room inconsistent with reports that she worked after the disability onset date.  (R. 32.)  In support of the ALJ's conclusion, the Commissioner cites evidence that Plaintiff performed some part-time work in 2012 and 2013.  (Doc. 20 at 7-8.)  Evidence that Plaintiff performed some part-time work in 2012 and 2013 is not inconsistent with Plaintiff's testimony that at the time of the 2015 administrative hearing she spent most of her time in her room.  Therefore, the ALJ erred in discounting this part of Plaintiff's testimony.

### d.  Testimony about Medication Side Effects

The ALJ also discounted Plaintiff's symptom testimony because Plaintiff testified that she had "adverse side effects from medication, but the record indicate[d] that these alleged side effects were brief . . . ."  (R. 32.)  The ALJ did not identify the medical evidence regarding side effects that was inconsistent with Plaintiff's symptom testimony.  (*Id.*); *see Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014)) (stating that to ensure meaningful review, the ALJ must specifically identify the claimant's testimony the ALJ finds not to be credible and explain what evidence undermines the testimony).  Thus, the ALJ did not provide a clear and convincing reason for discounting Plaintiff's symptom testimony on that basis.  The Court concludes that the "inconsistencies" in the record that the ALJ identified were not a clear and convincing reason for discounting Plaintiff's symptom testimony.

### 4.  Daily Activities

The ALJ concluded that Plaintiff's reported ability to perform personal care, prepare simple meals, do laundry, shop in stores, drive a car, spend time with others, and get along with authority figures suggested that Plaintiff's symptoms were not as limiting as Plaintiff alleged.  (R. 33.)  Plaintiff argues that her ability to perform daily activities was not a clear and convincing reason for discounting her symptom testimony.  (Doc. 16 at 21-22.)

An ALJ may reject a claimant's symptom testimony if the severity of the alleged symptoms is incompatible with the claimant's daily activities.  *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  Daily activities may also be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'"  *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  The ALJ did not make any finding as to how often Plaintiff engaged in the daily activities she identified or whether these activities were transferrable to a work setting.  (R. 32.)  Accordingly, Plaintiff's daily activities were an insufficient reason for discrediting her symptom testimony.

Although the Court does not accept all the reasons that the ALJ gave in support of her adverse credibility determination, the ALJ provided sufficient legally sufficient reasons that are supported by substantial evidence in support of her credibility determination and, therefore, the Court affirms that determination.  *See Batson*, 359 F.3d at 1197 (stating that the court may affirm an ALJ's overall credibility conclusion even when not all of the ALJ's reasons are upheld); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (stating that "[e]ven if we discount some of the ALJ's observations of [the claimant's] inconsistent statements and behavior . . . we are still left with substantial evidence to support the ALJ's credibility determination.").

/ / /

/ / /

/ / /

## VII. Conclusion

The Court concludes that the ALJ did not commit harmful legal error and that her determination is supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's disability determination.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff.

Dated this 19th day of December, 2018.


_____
Bridget S. Bade
United States Magistrate Judge